Mark E. Thomson, MN Bar No. 0398260*
mthomson@engstromlee.com
Carl F. Engstrom, MN Bar No. 0396298*
cengstrom@engstromlee.com
Charlie C. Gokey, MN Bar No. 0402225*
cgokey@engstromlee.com
ENGSTROM LEE LLC
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
T. (612) 305-8349; F. (612) 677-3050
*Admitted *Pro Hac Vice*
[Additional counsel appearing on signature page]
**Counsel for Plaintiffs**

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Andrews and Matthew Baker as representatives of a class of similarly situated persons, and on behalf of the Wilson Electric Services Corp. Employee Stock Ownership Plan,<br><br>Plaintiffs,<br><br>v.<br><br>Wilson Electric Services Corp., the Wilson Electric Services Corp. Plan Committee, Todd Klimas, Wesley McClure, Terry Oakes, Scott Smith, Jeri Kendle, and Rick Tometich,<br><br>Defendants. | Case No. 2:24-cv-00995-PHX-DJH<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

**NATURE OF THE ACTION**

1.    Plaintiffs Daniel D. Andrews and Matthew Baker, as the representatives of the Class described herein, and on behalf of the Wilson Electric Services Corp. Employee Stock Ownership Plan (the "ESOP"), bring this action pursuant to the Employee Retirement Income Security Act, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Wilson Electric Services Corp. ("Wilson"), the Wilson Electric Services Corp. Plan Committee (the "Committee"), Todd Klimas, Wesley McClure, Terry Oakes, Scott Smith, Jeri Kendle, and Rick Tometich (collectively, "Defendants"). This case is about Defendants' failure to invest the non-employer stock assets of the ESOP prudently and for the exclusive benefit of ESOP participants. The foregoing violated Defendants' fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1106(a).

**PARTIES**

2.    The ESOP is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6). The ESOP is sponsored by Wilson for the benefit of its employees.

3.    Plaintiff Daniel Andrews is a natural person and a resident of Gilbert, Arizona. He is a current participant in the ESOP. He worked for Wilson between 2019 and 2022. His ESOP account would be worth more today if not for Defendants' fiduciary mismanagement. His future ESOP account growth will be impaired if Defendants are not enjoined from further mismanagement.

4.    Plaintiff Matthew Baker is a natural person and a resident of Phoenix, Arizona. He is a current participant in the ESOP. He worked for Wilson between 2014 and 2022. His ESOP account would be worth more today if not for Defendants' fiduciary mismanagement. His future ESOP account growth will be impaired if Defendants are not enjoined from further mismanagement.

5. The Committee is the ESOP's governing committee established by the written terms of the ESOP. The Committee directs the ESOP's trustee with respect to how to invest ESOP assets. Accordingly, the Committee is a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i).

6. The ESOP Committee is currently comprised of the company's Board of Directors (the "Board"). There was previously a separate Committee, but its members were appointed by the Board, which was responsible for monitoring the Committee, and the Board exercised practical control over the ESOP's investments even during the period a separate Committee existed by directing the Committee.

7. Defendant Todd Klimas is a natural person and resident of Mesa, Arizona. Defendant Klimas served on the Board / Committee throughout the relevant period, and in that capacity approved, facilitated, and failed to rectify the fiduciary breaches at issue.

8. Defendant Wesley McClure is a natural person and resident of Mesa, Arizona. Defendant McClure served on the Board / Committee throughout the relevant period, and in that capacity approved, facilitated, and failed to rectify the fiduciary breaches at issue.

9. Defendant Terry Oakes is a natural person and resident of Phoenix, Arizona. Defendant Oakes served on the Board / Committee throughout the relevant period, and in that capacity approved, facilitated, and failed to rectify the fiduciary breaches at issue.

10. Defendant Scott Smith is a natural person and resident of Mesa, Arizona. Defendant Smith served on the Board / Committee throughout the relevant period, and in that capacity approved, facilitated, and failed to rectify the fiduciary breaches at issue.

11. Defendant Jeri Kendle is a natural person and resident of Phoenix, Arizona. Defendant Kendle served on the Board / Committee during the relevant period from 2020 to 2024, and in that capacity approved, facilitated, and failed to rectify the fiduciary breaches at issue.

12.    Defendant Rick Tometich is a natural person and resident of Massapequa, New York. Defendant Tometich served on the Board / Committee during the relevant period from at least 2018 to 2020, and in that capacity approved, facilitated, and failed to rectify the fiduciary breaches at issue.

13.    Defendant Wilson is the sponsor of the Plan. Acting through its Board of Directors, Wilson appoints and has the power to remove members of the Committee. As a result of its authority to appoint and remove fiduciaries of the ESOP, Wilson is itself a fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i), (iii).

## JURISDICTION AND VENUE

14.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

15.    This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

16.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants' violations of ERISA occurred in Tempe, Arizona where Wilson is located and where the ESOP is administered.

## DEFENDANTS' ACTIONS AND OMISSIONS WITH RESPECT TO THE ESOP'S OTHER INVESTMENTS ACCOUNT

17.    Wilson established the ESOP in 2005 to provide retirement benefits to employees. The ESOP averaged around 840 participants with account balances during the subject period.[1]

---

[1] ERISA claims cover six years from the date of filing. *See* 29 U.S.C. § 1113(1).

18.    The ESOP has two types of assets: Wilson stock and other investments. The other investments are known as the "Other Investments Account" ("OIA") per the ESOP's Summary Plan Description.

19.    Each participant's account value is equal to their *pro rata* share of the ESOP's total asset value. Each participant's benefit amount is equal to their account value at the time that it is distributed.

20.    Participants are credited with a share of company contributions and shares of Wilson stock while employed by Wilson. Participant credits are then adjusted over time—until distribution of their account—by investment gains, losses, and income on the ESOP's company stock and OIA investments.

21.    The ESOP has accumulated a large OIA balance. As of the ESOP's most recent annual report,[2] the OIA balance was $12.5 million. The ESOP's average OIA balance between 2018 and 2022 was $11.2 million.

22.    The OIA balance is allocated to participant accounts, with an average OIA balance of around $14,800 per participant (as of the most recent annual report). Plaintiff Andrews' vested OIA balance was around $18,000 per his most recent account statement. Plaintiff Baker's vested OIA balance was around $357,000 per his most recent account statement.

23.    Participants have no control over how the OIA is invested. Participants rely on Defendants to prudently invest the OIA funds for the purpose of increasing the value of participants' individual accounts.

24.    Defendants were responsible under the ESOP's Plan Document for setting the investment policy for the OIA and monitoring the performance of its investments.

_____

[2] The ESOP is required to file annual financial statements with the Department of Labor (DOL). The statement concerning the ESOP's financial condition as of December 31, 2022 is its most recently filed report. The next report concerning the period January 1, 2023 to December 31, 2023 is expected in late 2024.

-4-

25. Defendants kept the OIA funds invested exclusively in bank deposit and money market accounts during all or most of the subject period. Returns on these investments were negligible. From January 1, 2018 to December 31, 2022, the OIA earned a total of $309,490, or around 0.48% per year.

26. Defendants' strategy effectively guaranteed that the ESOP and its participants would suffer negative real rates of return. Defendants kept the OIA funds invested in short-term assets that have had lower rates of return than the rate of inflation over the last 20 years. This means that, over time, the OIA funds depreciated in real value, and the retirement savings of ESOP participants effectively shrunk. This is akin to Defendant simply hiding the OIA funds under a mattress.

27. The Committee's investment of the OIA is unusual and imprudent. Cash equivalents such as bank deposit and money market accounts are appropriate only if the investor has a short-term investment objective, needs to preserve their principal balance, and cannot tolerate market risk.

28. Bank and money market accounts are not designed or expected to provide competitive long-term capital appreciation needed by Plaintiffs and the Class.

29. A prudent fiduciary would have been aware of these facts. In the 30-year period between 1988 and 2017 (the last full calendar year before the beginning of the subject period), the ICE BofA 3-month Treasury Bill index—the index used most often for money market funds—averaged returns of 3.32% per year.[3] A $10,000 money market account in 1988 would have been worth around $27,000 in 2017. Considering inflation averaged 2.56% per year, that account would have barely held its value.

---

[3] Bank deposit interest rates are generally correlated with short-term treasury bills, the same as money market accounts, with bank deposit rates generally being lower. *See* Jordà, Òscar *et al.*, "The Rate of Return on Everything, 1870-2014", 134 Q.J. ECON. 1225, 1234 (2019) ("Rate of Return on Everything"). The ESOP's bank deposit holdings have generally earned around the same or lower rates than the ESOP's money market accounts. As of the ESOP's most recent annual report, the ESOP's only OIA investment holding is a money market account.

30.     In contrast, the S&P 500—the index used most often to measure large company domestic stocks—averaged a 10.70% annual rate of return between 1988 and 2017. The Russell 2000—the index most often used to measure small company domestic stocks—averaged a 10.46% annual rate of return. A $10,000 investment in 1988 earning these rates of return would have been worth between $197,000 and $211,000 in 2017. Stock investments easily beat inflation and provide significant capital appreciation to investors.

31.     Broader historical trends are the same. For 150 years in advanced economies throughout the world, "safe" investments in cash equivalents have beat inflation by around 1% per year on average, while stocks have outpaced inflation by around 7% per year.[4] As illustrated above, the difference between investing in cash and stocks over the length of a career is measured in the hundreds of thousands of dollars, even assuming a relatively small principal balance of $10,000.

32.     Monitoring recent market data also would have shown the Committee that cash equivalents earn significantly less over the long term, even when valued during declines in other asset classes.

33.     The illustration below ranks the 10-year average annual returns of stocks, bonds, and cash equivalents, as well as their calendar year returns. An investor over any 10-year period shown would have been far better off invested stocks and other asset classes than cash equivalents, even if the investor withdrew their balance at a low point for stocks and other assets.

---

[4] *See* Rate of Return on Everything, at 1228-30, 1241, 1280-81.

*10-Year Average Annual Returns and Calendar Year Returns Ranked, 2018-2023*[5]

| Asset Class | Metric | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|
| Large Cap Stocks | 10-Year Avg. | 13.12% | 13.56% | 13.88% | 16.55% | 12.56% | 12.03% |
| | 10-Year Rank | 1st | 1st | 1st | 1st | 1st | 1st |
| | Calendar Year | -4.38% | 31.49% | 18.40% | 28.71% | -18.11% | 26.29% |
| | Calendar Rank | 5th | 1st | 2nd | 1st | 6th | 1st |
| Small Cap Stocks | 10-Year Avg. | 11.97% | 11.83% | 11.20% | 13.23% | 9.01% | 7.16% |
| | 10-Year Rank | 2nd | 2nd | 2nd | 2nd | 2nd | 2nd |
| | Calendar Year | -11.01% | 25.52% | 19.96% | 14.82% | -20.44% | 16.93% |
| | Calendar Rank | 7th | 2nd | 1st | 2nd | 7th | 3rd |
| High Yield Bonds | 10-Year Avg. | 11.12% | 7.57% | 6.80% | 6.83% | 4.03% | 4.60% |
| | 10-Year Rank | 3rd | 4th | 4th | 4th | 4th | 3rd |
| | Calendar Year | -2.08% | 14.32% | 7.11% | 5.28% | -11.19% | 13.45% |
| | Calendar Rank | 4th | 5th | 5th | 4th | 4th | 4th |
| Long-Term Bonds | 10-Year Avg. | 7.40% | 7.99% | 8.24% | 6.42% | 2.13% | 3.88% |
| | 10-Year Rank | 4th | 3rd | 3rd | 5th | 5th | 5th |
| | Calendar Year | -6.76% | 23.36% | 13.32% | -1.18% | -25.29% | 10.73% |
| | Calendar Rank | 6th | 3rd | 3rd | 8th | 8th | 5th |
| International Stocks | 10-Year Avg. | 6.24% | 5.32% | 5.19% | 7.84% | 4.59% | 4.32% |
| | 10-Year Rank | 5th | 5th | 5th | 3rd | 3rd | 4th |
| | Calendar Year | -14.09% | 22.49% | 7.59% | 12.62% | -14.29% | 17.94% |
| | Calendar Rank | 8th | 4th | 5th | 3rd | 5th | 2nd |
| Intermediate-Bonds | 10-Year Avg. | 4.84% | 4.25% | 4.18% | 3.53% | 1.75% | 2.46% |
| | 10-Year Rank | 6th | 6th | 6th | 6th | 6th | 6th |
| | Calendar Year | 0.01% | 9.52% | 7.08% | -1.03% | -9.10% | 6.94% |
| | Calendar Rank | 3rd | 6th | 6th | 7th | 3rd | 6th |
| Short-Term | 10-Year Avg. | 1.52% | 1.54% | 1.60% | 1.39% | 0.88% | 1.27% |
| | 10-Year Rank | 7th | 7th | 7th | 7th | 7th | 7th |
| | Calendar Year | 1.60% | 4.03% | 3.33% | -0.47% | -3.69% | 4.61% |
| | Calendar Rank | 2nd | 7th | 7th | 6th | 2nd | 8th |
| Cash Equivalents | 10-Year Avg. | 0.37% | 0.58% | 0.64% | 0.63% | 0.76% | 1.25% |
| | 10-Year Rank | 8th | 8th | 8th | 8th | 8th | 8th |
| | Calendar Year | 1.87% | 2.28% | 0.67% | 0.05% | 1.46% | 5.01% |
| | Calendar Rank | 1st | 8th | 8th | 5th | 1st | 7th |

34. No prudent fiduciary shopping from this menu during the subject period would invest 100% of their portfolio in cash equivalents for the long term—yet Defendants did just that.

35. Investments in each major asset class were available to Defendants throughout the subject period. Defendants could have invested OIA funds in each asset class by selecting a passively managed fund that tracks the corresponding index. Defendants also could have selected an actively managed fund that seeks out the best individual securities within the asset class.

36. Defendants did none of these things and failed to consider other asset classes or implement a prudent long-term investment strategy for the OIA.

[5] Asset classes are represented by the following indexes: Large Cap Stocks—S&P 500; Small Cap Stocks—Russell 2000; High Yield Bonds—Bbg US Corp High Yield; International Stocks—MSCI World Ex US; Long-Term Bonds—Bbg US Long Credit; Intermediate-Term Bonds—Bbg US Interm Credit; Short-Term Bonds—Bbg US Gov/Credit 1-3Y; Cash Equivalents--ICE BofA US 3M Trsy Bill.

-7-

37.    Indeed, Defendants did not even consider whether the OIA should be invested in anything other than cash until 2022. Even upon realizing that they had acted imprudently, Defendants delayed an additional two years before taking even minor, inadequate steps to correct their imprudent allocation of ESOP assets. The allocation of the ESOP's OIA to cash during the class period was thus not the result of any decision that this investment was in the best interests of the ESOP and its participants. Rather, it was primarily the product of neglect.

38.    Acknowledging that they had a fiduciary duty to prudently invest the OIA assets, as well as the imprudence of their prior all-cash approach, Defendants belatedly adopted a new investment policy in March 2024 under which Defendants would no longer invest OIA funds exclusively in bank deposit and money market accounts. The new investment policy diversified the OIA to include 15-25% stocks and set a target rate of return of 4%—well above the returns the OIA enjoyed during all or nearly all of the relevant time. The recent adoption of this policy highlights the mismanagement of OIA funds during the class period.

39.    The new investment policy, however, remains imprudent in its allocation of OIA funds and significantly out of step with how other ESOP fiduciaries manage OIA assets. It was adopted without significant analysis of the ESOP's needs and interests, which Defendants understood. It still does not align the ESOP's investment strategy with the time horizon, financial objectives, and risk tolerance of the ESOP's beneficiaries. The policy further evinces Defendants' disloyalty in that it is explicitly designed to fund the company's recycling of shares rather than to provide retirement benefits for ESOP participants.

40.    The "consensus" asset allocation decisions of professional retirement portfolio managers further illustrate Defendants' imprudence. A common investment for defined contribution plan participants is called a "target date" fund. Around 60% of

401(k) plan participants invest in them.[6]  In a target date fund, professional portfolio managers allocate assets between asset classes based on the number of years the fund's investors have until retirement. The industry consensus asset allocations are: at least 90% stocks for 30-year time horizons, 80% stocks for 20 years, and 60% stocks for 10 years from retirement.[7] Even retired investors using the fund for income distributions are allocated around 30% stocks, according to industry consensus. *Id.*

41.     The behavior of prudent ESOP fiduciaries acting under similar circumstances is also illustrative. Prudent fiduciaries do not sideline non-employer stock assets in cash, as Defendants have done. One approach is to allow participants to direct their OIA balances to funds that offer exposure to stocks and other asset classes (such as target date funds). This is accomplished by offering such funds within the ESOP, or by allowing participants to move balances to the company's 401(k) plan. Either approach would be appropriate for Wilson, as all ESOP participants also participate in the company's 401(k) and profit-sharing plan.

42.     Even where the ESOP fiduciary retains sole investment control and the plan does not allow ESOP-to-401(k) transfers, Defendants' conduct is not the norm. When ESOPs accumulate excess funds not invested in employer stock, prudent and loyal ESOP fiduciaries invest the excess funds in assets that offer greater potential for long-term capital appreciation than cash equivalents.

43.     For example, fiduciaries of the Great Lakes Cheese Co., Inc. Employee Stock Ownership Plan kept approximately 95% of their plan's OIA assets invested in common stocks (directly or through pooled funds) during the subject period. The

---

[6] *See* Holden, Sarah *et al.*, "401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2020," EBRI Issue Brief No. 576, and ICI Research Perspective, vol. 28, no. 11 (November 2022), *available at* https://www.ebri.org/content/401%28k%29-plan-asset-allocation-account-balances-and-loan-activity-in-2020 (last visited May 1, 2024).
[7] *See* Preston, Hamish, "S&P Target Date Scorecard," at 4, *available at* https://www.spglobal.com/spdji/en/documents/commentary/research-target-date-scorecard-year-end-2020.pdf (last visited May 1, 2024).

fiduciaries of the SCS Engineers Employee Stock Ownership Plan kept upwards of 60% of OIA funds invested in stocks (directly or through pooled funds), and most of the remaining OIA balance in real estate and bonds. These ESOPs only hold cash for limited periods before investing the funds pursuant to their overall long-term investment strategy.

44.     Defendants' allocation of 100% of the OIA balance to cash equivalents and short-term treasuries is substandard among fiduciaries managing similar OIA balances under similar circumstances. In 2022, there were 49 ESOPs that invested primarily in company stock, did not take participant contributions, and held between $5 and $15 million in OIA funds throughout the year. All but 11 of these ESOPs invested in stock, with their median allocation of OIA funds to stocks being 43%. Among this roughly 80% majority of prudently managed ESOPs, the median allocation of OIA funds to cash and short-term treasuries was just 17%. Defendants' allocation of 100% of OIA funds to cash and short-term treasuries during the class period was thus far outside the norm.

45.     The cost of Defendants' mismanagement during the subject period has been high. Between May 1, 2018 and December 31, 2022, Plaintiff estimates that the OIA earned around $280,000 from Defendants' investments. Had Defendants invested the OIA in an index fund tracking the S&P 500 over the same period, Plaintiff estimates that the Plan would have earned around $5.2 million. Defendants' fiduciary neglect cost ESOP participants around $4.9 million during this period, or more than $5,800 per participant.[8]

46.     Since December 31, 2022, stocks have further outpaced cash equivalents by a large degree (as of November 14, 2024). Even assuming Defendants have implemented the slightly improved but still imprudent new investment policy for the OIA, the ESOP's loss during the subject period will have surpassed $4.9 million, and the damages amount should be updated at the time of trial.

---

[8] The per participant calculation is based on the ESOP's average number of participants with account balances during the period, 840.

47.     The long-term loss for ESOP participants as a result of Defendants' mismanagement will be severe, if it is allowed to persist. A 6% average annual return differential between cash and stocks over next 10 years will produce a deficit of around $14,000 for an ESOP participant with an average OIA balance of $14,800 today.[9] Over 20 years, the deficit would grow to $47,000. In 30 years, the loss would be $122,000 per participant.

48.     Defendants cannot excuse their investment of 100% of OIA funds in cash after the fact by characterizing the ESOP's risk tolerance as low, or the time horizon for OIA investments as short-term. Neither is true.

49.     First, employee stock plans such as the ESOP invest primarily or exclusively in a single company's stock, which means that they have an aggressive risk tolerance. The ESOP's purpose is to provide a retirement benefit that will grow over time, not to preserve the value of the principal amount invested.

50.     Second, ESOP participants generally must reach retirement age or be separated from Wilson for 10 years before they can receive their full account balance.[10] Accordingly, participants are invested in the ESOP for the long term in fact, not just in theory. Indeed, for most former employees, the only assets in their accounts following their separation from the company are OIA funds. This mean that their account earnings between their separation from Wilson and the distribution of their accounts are substantially limited due to Defendants' failure to prudently invest OIA funds.

---

[9] Estimated 10-, 20-, and 30-year loss calculations are based on the DOL's model for quantifying retirement savings losses. *See* Department of Labor, "A Look at 401(k) Plan Fees," at 2 (Sept. 2019), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited May 1, 2024). The model assumes no additional contributions are made. Plaintiff's adaptation of the DOL model assumes an 8% average annual rate of return on stocks and a 2% average annual rate of return on cash equivalents, consistent with the long-term historical average differential of around 6%. *See supra*, paragraph 22 and note 4.

[10] Installment distributions may begin in the 6th year after separation, continuing through the 10th year.

51.    Third, long-term capital appreciation is the default objective of retirement investments. The Department of Labor, which oversees employee retirement plans, has instructed that "investments made on behalf of . . . participants ought to and often will be long-term investments," warning that overallocation to cash strategies will "decreas[e] the likelihood that participants . . . have adequate retirement savings."[11]

52.    Defendants' failure to invest the OIA in a manner that is consistent with the ESOP's long-term investment objective is also not excused by the fact that a portion of the OIA balance was used to expand the ESOP's ownership stake in the company in May 2019. First, less than half of the accumulated OIA balance as of May 2019 was used in that transaction. Saving for the May 2019 share purchase cannot explain why the $9 million of OIA funds not used in that transaction was not prudently invested in a long-term investment strategy. Second, following the May 2019 transaction, the ESOP owns 100% of Wilson's stock. There has been no other owner to buy out since May 2019, so saving for that purpose cannot explain why Defendants have kept the remaining, and growing, OIA balance invested exclusively in cash equivalents.

53.    Defendants' practice of using the ESOP to recycle shares between participants also is not an after-the-fact excuse for Defendants' neglect of the OIA. Recycling is when the ESOP converts shares of Wilson stock that are allocated to departing participants into cash and then re-allocates those shares to other participants. Preserving a large ESOP cash base for this purpose is unnecessary, imprudent, and disloyal.

54.    Privately held companies must offer a "put option" to employees invested in the company's stock through an ESOP. 26 U.S.C. § 409(h). A put option is the "right to require that the employer repurchase employer securities under a fair valuation formula." *Id.* § 409(h)(1)(B). The repurchase obligation cannot be placed upon the ESOP:

---

[11] 72 Fed. Reg. 60452, 60463.

-12-

"Under no circumstances may the put option bind the ESOP." 29 C.F.R. § 2550.408b-3(j).

55.    An ESOP fiduciary may elect, but has no right or obligation, to convert departing participant stock accounts to cash and recycle the shares. Such a decision is subject to ERISA fiduciary duties, and the transaction must be a prudent investment action for ESOP participants at the time of the transaction.

56.    In Defendants' share recycling program, Defendants are exercising their fiduciary discretion to cause shares allocated to departing participants to be converted to cash inside the ESOP.

57.    There is no special value to be captured by recycling shares inside the ESOP, as the shares must be converted to cash at the stock's current fair market value. 26 U.S.C. § 409(h)(1)(B). Causing the ESOP to redeem the shares is also not necessary in order to allocate the shares to new participants. If the company wants shares that are allocated to departing participants to be re-allocated to new participants, the company may redeem the shares and then contribute them to the ESOP for allocation to new participants.

58.    The amount of cash that Defendants hold in the OIA is around nine times larger than the typical amount of cash that the ESOP needs to distribute to participants each year. In every year of the subject period except 2020, the amount of new cash received by the ESOP has been two to four times the amount of cash distributed.[12] The ESOP's positive cash flow after distributions has also been more than sufficient to meet

---

[12] Contributions in 2022, 2021, 2019, and 2018, respectively, were $5,495,500, $5,281,700, $5,605,750, $3,845,750, and $3,045,000, compared to distributions of $1,859,579, $1,275,896, $1,228,790, and $1,178,088. The most recent OIA balance of $12.5 million is 9 times the average distribution amount in these years of around $1.37 million. Distributions in 2020 exceeded contributions due to special one-time distribution allowances. The OIA still maintained a balance of more than $5.7 million at year end 2020 despite the excess distributions, and the OIA balance grew to $12.5 million by year-end 2022 as the typical pattern of contributions greatly exceeding distributions resumed.

the ESOP's long-term debt service associated with the May 2019 share purchase.[13] In sum, the ESOP has consistently been able to fund the recycling program and meet all other liabilities from current cash income.

59.    To the extent that Defendants claim, after the fact, to be maintaining the OIA in cash equivalents as a stable back-up reserve to fund the share recycling program, that is wrong as a factual matter. The majority of OIA assets are allocated to the accounts of former employees. These OIA assets are not used for the recycling program at all.

60.    Even to the limited extent OIA assets are used for the recycling program, Defendants' conduct is imprudent and disloyal. The recycling program and a prudent long-term investment strategy for OIA funds are not exclusive.

61.    First, Defendants do not have, and have not had, specific reasons to believe that same-year cash contributions will not be available for cash conversions in future years. Since 2015, Wilson's share price has increased every year, meaning that Defendants believe the same profit levels that have consistently sustained large cash contributions to the ESOP will continue or improve in the future.[14] Defendants can reasonably expect that the ESOP will be able to complete future recycling transactions (if prudent and in the interest of participants), and they do not need the entire OIA balance to be sidelined in cash to do it.

62.    Second, the ESOP is not obligated to convert shares to cash—the company is. Repurchase liability is not a liability that the ESOP needs to manage.

63.    Third, the merit of recycling transactions for the ESOP cannot be foreseen years in advance, so earning negligible returns in the meantime is not a reasonable tradeoff.

---

[13] A portion of the May 2019 purchase was funded by a 20-year loan. The ESOP owes $460,000 each year of principal and interest payments on the loan.

[14] According to the ESOP's annual financial statements, a primary valuation input for Wilson stock is the company's future projections of net income.

64.    Fourth, investments in stock index funds and other available funds can be liquidated in a few days if the built-up OIA balance is needed to substitute for lack of same-year contributions. Over the lengthy period for which Defendants have stockpiled cash, stock investments are the safer bet to maximize funds for recycling transactions, not cash equivalents.

65.    While adopting a principal preservation strategy for the OIA does not serve participants, it does benefit the company. Maintaining a stable backup reserve provides security for the company regarding its long-term liability to repurchase company shares from ESOP participants. But here the company's interests depart from participants' interests. The company wants only to guarantee that a sufficient amount has been set aside to meet its liability, while the ESOP's participants want that money to grow to increase their retirement benefits.

66.    ERISA prohibits fiduciaries from using plan assets for the benefit of the company and from subordinating participant interests to company interests. A company cannot commit funds to employee retirement accounts and then use those funds as a corporate finance tool. Defendants violated ERISA because their OIA investment strategy prioritizes satisfying the long-term share repurchase liability of the company over growing participants' retirement benefits.

67.    Defendants also had a duty to monitor the OIA investments held by the Plan, and remove those that were imprudent or disloyal. Not only did Defendants act disloyally by investing dividends and contributions in cash, but also by failing to monitor those investments and move them into prudent investments appropriate for a group of participants investing for retirement.

**DEFENDANTS' UNEQUAL TREATMENT OF ESOP PARTICIPANTS**

68.    In addition to imprudently managing the ESOP's OIA funds, Defendants have breached their fiduciary duties by giving preferential treatment to particular ESOP participants at the expense of others.

-15-

69.     The ESOP's participants include both current and former employees of the company. When an ESOP participant leaves the company, they are not immediately eligible for a distribution of their ESOP account balance unless they are of retirement age. Otherwise, the participant generally must wait six years from their separation from the company, at which point they may receive a distribution of their ESOP account in installments over the next four years. ESOP participants who leave the company for reasons other than retirement thus typically cannot fully withdraw their account balance in the ESOP for a minimum of ten years.

70.     Defendants nonetheless treat most, but not all, ESOP participants who are former employees less favorably than ESOP participants who are current employees. Defendants typically require that, when an ESOP participant leaves the company, 100% of the employer stock in their account must be sold, with the proceeds transferred to the OIA, within one year of a participant's separation from the company. This means the participant's account balance effectively ceases to grow and stagnates for a full decade after they leave the company. And because that money will be held in cash over an extended period before it is distributed, the resulting lost investment earnings are substantial.

71.     Defendants apply this rule selectively. Some former employees are permitted to remain invested in company stock following their separation from the company. On information and belief, in practice, whether a former employee's ESOP-held stock is sold upon their departure from the company depends on Defendants' arbitrary personal preferences. Defendants do not take into account the best interests of the ESOP or its participants in applying this policy unevenly.

72.     Defendants did not act prudently or in the best interests of participants who had left employment with the company when they required most of these participants to sell their employer stock. A prudent and loyal fiduciary would have permitted departing employees to hold onto their employer stock.

-16-

73.     Defendants further breached their duties by holding 100% of those employees' plan accounts in a cash position. Had they abided by their fiduciary duties, Defendant would have invested the ESOP accounts of former employees so as to provide competitive long-term capital appreciation needed by Plaintiffs and the Class.

74.     Notably, Defendants do not use the cash in former employees' accounts to recycle shares—that money simply sits unused, generating virtually no investment gains and serving no purpose. Additionally, the recently-adopted investment policy is improperly designed for this group of employees, as its stated goal of providing sufficient liquidity to permit share recycling did not apply to the accounts of former employees, whose account assets are not being used for that purpose.

75.     Not only did Defendants breach their fiduciary duties by selling all employer stock held by participants who were leaving employment with the company and subsequently moving that money to cash, they further breached their duties by failing to monitor those investments, and move them into assets that were appropriate for these participants' financial goals and time horizon.

76.     Plaintiffs are two of the former employees selectively subjected to this punitive policy. They, and other former employees subjected to the same policy, have suffered substantial investment losses by virtue of having their ESOP accounts invested and in cash and held for an extended period.

77.     Having breached their fiduciary duties by selectively applying a punitive policy to former employees, Defendants are liable to make whole the losses suffered by those former employees.

### PLAINTIFFS' LACK OF ACTUAL KNOWLEDGE

78.     Until shortly before filing this action, Plaintiffs lacked knowledge of material information to support these claims. Among other things, they lacked knowledge of (1) the ESOP's net cash flows and accumulated cash balances, which is necessary to evaluate the time horizon and prudence of OIA investments; (2) the performance of other

asset classes over relevant periods; and (3) the conduct of similarly situated ESOP fiduciaries who invest their plans' OIA funds in stocks and other asset classes. Plaintiffs also lacked actual knowledge of Defendants' fiduciary process and had no means to access such information until discovery commenced.

## PLAN-WIDE RELIEF

79.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision.

80.     Plaintiffs seek recovery for injuries to the ESOP sustained as a result of fiduciary breaches and equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

81.     Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

82.     Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

83.     With respect to Counts I and II, Plaintiffs assert these claims on behalf of a class of participants and beneficiaries of the ESOP (the "ESOP Class") defined as follows:

> All participants and beneficiaries of the Wilson Electric Services Corp. Employee Stock Ownership Plan since the date that is six years prior to the filing of this action.

84. With respect to Count III, Plaintiffs assert these claims on behalf of a subclass of participants and beneficiaries of the ESOP (the "Former Employee Class") defined as follows:

All participants and beneficiaries of the Wilson Electric Services Corp. Employee Stock Ownership Plan who, within the six years prior to the filing of this action, separated from the company and whose accounts were converted from company stock to cash or OIA.

85. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had hundreds of participants during the relevant period.

86. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are ESOP participants and suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

87. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

88. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.   Whether Defendants were fiduciaries with respect to the ESOP and the scope of their fiduciary duties;

    b.   Whether Defendants failed to comply with the ERISA fiduciary standards of prudence, loyalty, and impartiality in violation of 29 U.S.C. § 1104(a)(1);

    c.     Whether Defendants invested ESOP assets for the benefit the company, a party in interest the ESOP, in violation of 29 U.S.C. § 1106(a);

    d.     The proper form of equitable and injunctive relief; and

    e.     The proper measure of monetary relief.

89.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

90.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

91.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

92.    Plaintiffs and undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

### COUNT I

### 29 U.S.C. § 1104(a)(1) – Mismanagement of the ESOP's OIA

93.    Plaintiffs incorporate the foregoing paragraphs by reference.

94.    Defendants were ESOP fiduciaries with discretion concerning how the ESOP assets contained within the OIA are invested.

95.    Defendants violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to prudently invest the OIA in a manner consistent with the investment objectives of the ESOP and its participants, and by allowing company interests to dictate its investment strategy.

96.    Defendant Wilson violated ERISA fiduciary standards by failing to monitor the Board / Committee's management of the Plan and failing to ensure that the Committee was investing the OIA with the care, skill, and diligence appropriate under the circumstances. Defendant Wilson further failed to mandate compliance or remove fiduciaries when the Board / Committee failed to abide by their fiduciary duties.

97.    Defendants' violations of 29 U.S.C. § 1104(a)(1) caused the ESOP injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect participants' ESOP accounts.

98.    Each Defendant is also liable for the fiduciary breaches of the other under 29 U.S.C. § 1105 as a co-fiduciary.

99.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiffs, the ESOP, and the Class are entitled to recover losses caused by Defendants' violations of 29 U.S.C. § 1104(a)(1) and other equitable and injunctive relief.

## COUNT II

### 29 U.S.C. § 1106(a) – Mismanagement of the ESOP's OIA

100. Plaintiffs incorporate the foregoing paragraphs by reference.

101. Defendants were ESOP fiduciaries with discretion concerning how the ESOP assets contained within the OIA are invested.

102. Defendant Wilson is a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(C) because its employees are the ESOP's participants.

103. Defendants violated 29 U.S.C. § 1106(a)(1)(D) by using OIA funds for the benefit of Wilson by pursuing a principal preservation strategy for the OIA for the purpose of providing Wilson security concerning its long-term liability to repurchase Wilson stock from ESOP participants.

104. Defendants' violation of 29 U.S.C. § 1106(a) caused the ESOP injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect participants' ESOP accounts.

105. Defendant Wilson is liable for its co-Defendants' violations of Section 1106(a) as a co-fiduciary, pursuant to 29 U.S.C. § 1105, because Wilson knew that the Board / Committee was failing to invest OIA funds exclusively for the benefit of ESOP participants and failed to intervene.

106. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiffs, the ESOP, and the Class are entitled to recover losses caused by Defendants' violation of 29 U.S.C. § 1106(a) and other equitable and injunctive relief.

### COUNT III
### 29 U.S.C. § 1104(a)(1) – Breach of Fiduciary Duty as to Former Employee Subclass

107. Plaintiffs incorporate the foregoing paragraphs by reference.

108. Defendants were ESOP fiduciaries with discretion over how ESOP participant accounts would be invested after an ESOP participant separated from the company.

109. ERISA imposes a fiduciary duty to deal with plan participants and beneficiaries impartially and in an even-handed manner, and to not prefer or advance the interests of some participants over others.

110. Defendants violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1), including their duty of impartiality, when they selectively forced participants to convert their ESOP accounts from company stock to cash and OIA upon separating from the company.

111. These actions also violated the duties of prudence and loyalty, because selling all employer stock was not a prudent investment decision, nor was it made in the best interests of the participants who had left employment.

112. Additionally, Defendants failed to exercise the skill, care, and diligence a similarly-situated fiduciary would use when, after liquidating all company stock, they held 100% of the account balance of former employee participants in a cash position.

113. Defendant Wilson is liable for its co-Defendants' violations of Section 1106(a) as a co-fiduciary, pursuant to 29 U.S.C. § 1105, because Wilson knew that its co-Defendants had violated their fiduciary duties in this manner.

114. Defendants' fiduciary breaches caused significant investment losses to Plaintiffs and other former employees who were selectively forced to convert their ESOP accounts from company stock to cash and OIA upon separating from the company.

115. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiffs, the ESOP, and the Subclass are entitled to recover losses caused by Defendants' fiduciary breaches from Defendants.

**PRAYER FOR RELIEF**

116.    Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as class representatives, and certify undersigned counsel as class counsel;

C.    Order Defendants to make good to the ESOP all losses resulting from their violations of ERISA;

D.    Impose equitable remedies, including, but not limited to, surcharge on Defendants requiring them to make whole ESOP participants who were selectively forced to convert their ESOP accounts from company stock to cash and OIA upon separating from the company;

E.    Impose equitable and injunctive relief sufficient to protect ESOP participants, including changes to Defendants' investment process and/or appointment of independent investment advisors and managers;

F.    Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

G.    Award prejudgment and post-judgment interest; and

H.    Award such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

Dated: January 6, 2025

**ENGSTROM LEE LLC**

/s/Charlie C. Gokey
Mark E. Thomson, MN Bar No. 0398260*
mthomson@engstromlee.com
Carl F. Engstrom, MN Bar No. 0396298*
cengstrom@engstromlee.com
Charlie C. Gokey, MN Bar No. 0402225*
cgokey@engstromlee.com
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050

**HEANEY LAW FIRM, LLC**
Mark L. Heaney, AZ Bar No. 022492
mark@heaneylaw.com
601 Carlson Parkway, Suite 1050
Minnetonka, MN 55305
Telephone: (952) 933-9655
Facsimile: (952) 487-0189

*Admitted *Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFFS**