Lars C. Golumbic, *admitted pro hac vice*
Andrew D. Salek-Raham, *admitted pro hac vice*
Lawrence A. Brett, *admitted pro hac vice*
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, N.W.
Suite 1200
Washington, D.C. 20006
(202) 857-0620 (phone)
(202) 659-4503 (fax)
lgolumbic@groom.com
asalek-raham@groom.com
lbrett@groom.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Daniel Andrews and Matthew Baker as representatives of a class of similarly situated persons, and on behalf of the Wilson Electric Services Corp. Employee Stock Ownership Plan,<br><br>Plaintiffs,<br><br>v.<br><br>Wilson Electric Services Corp.; the Wilson Electric Services Corp. Plan Committee; Todd Klimas; Wesley McClure; Terry Oakes; Scott Smith; Jeri Kendle; and Rick Tometich,<br><br>Defendants. | No. 2:24-CV-00995-PHX-DJH<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW** |

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 2

III. BACKGROUND ........ 3

A. ESOP Participants Are Entitled to the Value of Vested Shares at Separation. ........ 3

B. The ESOP Recycles Shares to Keep Them Within the Plan. ........ 4

IV. ARGUMENT ........ 5

A. Defendants did not Act Imprudently. ........ 5

1. The Ninth Circuit foreclosed Plaintiffs' theory in *Anderson*. ........ 6

2. Congress Exempted ESOPs from ERISA's Duty to Diversify. ........ 7

B. The TAC Alleges that Defendants Acted *Prudently*. ........ 9

1. The ESOP's assets were managed to ensure the ESOP's sustainability. ........ 9

2. Even under Plaintiffs' novel theory, Defendants still acted prudently. ........ 11

3. The Court cannot infer imprudence from the other ESOPs referenced in the TAC. ........ 14

C. Plaintiffs Fail to Allege that the Individual Defendants are Fiduciaries. ........ 15

D. Plaintiffs Fail to State Monitoring & Co-fiduciary Liability Claims. ........ 17

## TABLE OF AUTHORITIES


Page(s)

**Cases**

*Alas v. AT&T Inc.*,
No. LACV 17-08106, 2019 WL 1744847 (C.D. Cal. Feb. 25, 2019) .......... 16

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
137 F.4th 1015 (9th Cir. 2025) .......... *passim*

*Armstrong v. Amsted Indus., Inc.*,
No. 01 C 2963, 2004 WL 1745774 (N.D. Ill. July 30, 2004) .......... 3, 4

*Armstrong v. LaSalle Bank N.A.*,
446 F.3d 728 (7th Cir. 2006) .......... 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 1, 2, 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 2, 9

*Cheap Easy Online Traffic Sch. v. Peter L. Huntting & Co.*,
818 F. App'x 683 (9th Cir. 2020) .......... 16

*Chesemore v. Fenkell*,
829 F.3d 803 (7th Cir. 2016) .......... 16

*Daly v. W. Monroe Partners, Inc.*,
No. 21 C 6805, 2023 WL 2525362 (N.D. Ill. Mar. 15, 2023) .......... 17

*Estate of Blount v. Comm'r*,
87 T.C.M. (CCH) 1303, No. 540-02, 2004 WL 1059517 (T.C. 2004) .......... 4, 9

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) .......... 3, 7, 8, 9

*Fish v. GreatBanc Tr. Co.*,
No. 09 C 1668, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016) .......... 3, 4, 10, 11

*Fish v. GreatBanc Tr. Co.*,
749 F.3d 671 (7th Cir. 2014) .......... 11

*Gamino v. KPC Healthcare Holdings, Inc.*,
No. 5:20-cv-1126, 2022 WL 4596576 (C.D. Cal. Aug. 15, 2022) .......... 10

*Hughes v. Northwestern University*,
595 U.S. 170 (2022) .......... 3, 10

*In re JDS Uniphase Corp. ERISA Litig.*,
No. C 03-04734, 2005 WL 1662131 (N.D. Cal. July 14, 2005) .......... 16

*In re Unisys Sav. Plan Litig.*,
173 F.3d 145 (3d Cir. 1999) .......... 12

*Kayes v. Pac. Lumber Co.*,
51 F.3d 1449 (9th Cir. 1995) .......... 16

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
541 F. Supp. 3d 496 (D.N.J. 2021) .......... 16

*Marder v. Lopez*,
450 F.3d 445 (9th Cir. 2006) .......... 4

*Mohamed v. Uber Technologies, Inc.*,
848 F.3d 1201 (9th Cir. 2016) .......... 7

*Monper v. Boeing Co.*,
104 F. Supp. 3d 1170 (W.D. Wash. 2015) .......... 17

*Pegram v. Herdrich*,
530 U.S. 211 (2000) .......... 15

*Perrone v. Johnson & Johnson*,
48 F.4th 166 (3rd Cir. 2022) .......... 8, 10

*Phillips v. Cobham Adv. Elec. Solutions, Inc.*,
No. 23-cv-3785, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) .......... 11, 15

*Trull v. Bd. of Trs. of McCreary Modern, Inc. Emp. Stock Ownership Plan*,
No. 5:25-cv-11, 2025 WL 2803605 (W.D.N.C. Oct. 1, 2025) .......... 2, 6, 8, 9, 10

*Vang v. Geil Enters. Inc.*,
No. 1:23-cv-447, 2023 WL 3168513 (E.D. Cal. Apr. 28, 2023) .......... 16

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) .......... 11

*White v. Chevron Corp.*,
No. 16-cv-793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .......... 17

*Wright v. Or. Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) .......... 6, 17

**Statutes**

26 U.S.C. § 401 .......... 3

26 U.S.C. § 409 .......... 3

29 U.S.C. § 1102 .......... 15

29 U.S.C. § 1104 .......... 1, 7, 9, 15

29 U.S.C. § 1107 .......... 3

A.R.S. § 10-3824 .......... 17

**Rules**

29 C.F.R. § 2550.404a-1 .......... 13

Fed. R. Civ. P. 12(b)(6) .......... 1

Defendants Wilson Electric Services Corp. ("WESC" or the "Company"), Wilson Electric Services Corp. Plan Committee (the "Committee"), Todd Klimas, Wesley McClure, Terry Oakes, Scott Smith, Jeri Kendle, and Rick Tometich (collectively, "Defendants"), by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule of Civil Procedure 7.2, respectfully request that the Court dismiss Plaintiffs' Third Amended Complaint (Dkt. 154, the "TAC") with prejudice for the reasons set forth herein.

## I. INTRODUCTION

Plaintiffs challenge the capital preservation investment strategy of non-company stock assets held in the Wilson Electric Services Corp. Employee Stock Ownership Plan (the "ESOP"). They claim that investing the ESOP's Other Investments Account ("OIA") monies in conservative, liquid investments to mitigate risk is a per se violation of the fiduciary duty of prudence under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1104. To wit, Plaintiffs allege that "***[n]o prudent fiduciary*** . . . would invest 100% of their portfolio in cash equivalents," and that "[t]he ESOP's purpose is to provide a retirement benefit that will grow over time, not to preserve the value of the principal amount invested." TAC ¶¶ 34, 49 (emphasis added). But Plaintiffs' TAC fails to plausibly state a claim. *See* Fed. R. Civ. P. 12(b)(6); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

***First***, since Plaintiffs filed this case, the Ninth Circuit has expressly foreclosed their theory of liability. *See Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015 (9th Cir. 2025), *cert. pet. docketed*, No. 25-498 (U.S. Oct. 20, 2025). In affirming the dismissal of an ERISA duty of prudence claim challenging a risk-mitigating investment strategy, the *Anderson* court held that "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns," highlighting that "courts have routinely rejected claims that an ERISA fiduciary can violate the duty of prudence by seeking to minimize risk." *Id.* at 1024 (citations omitted).

***Second***, another court recently rejected a near-identical complaint filed by Plaintiffs' counsel. *See Trull v. Bd. of Trs. of McCreary Modern, Inc. Emp. Stock Ownership Plan*, No. 5:25-cv-11, 2025 WL 2803605 (W.D.N.C. Oct. 1, 2025), *appeal docketed*, No. 25-2337 (4th Cir. Nov. 3, 2025). In holding that Plaintiffs' claim is "a remedy in search of a wrong," the *Trull* court explained that "[r]equiring an ESOP fiduciary to walk such a precarious tightrope" with respect to OIA holdings "risks subverting Congress's objective to encourage employers to establish and maintain ESOPs." *Id.* at *3, *4. Indeed, this "is the very type of claim Congress sought to protect against when it exempted ESOPs from the diversification obligation arising from the fiduciary duty of prudence." *Id.* at *3.

***Third***, far from alleging imprudence, Plaintiffs' allegations actually demonstrate that Defendants acted prudently, including because the ESOP's average asset allocation—80% equity, 20% fixed income—is ***exactly*** what Plaintiffs themselves claim is appropriate for an investor with a long time horizon.

***Finally***, Plaintiffs reach too far in naming Todd Klimas, Wesley McClure, Terry Oakes, Scott Smith, Jeri Kendle, and Rick Tometich (the "Individual Defendants") in this suit. Fatal to their claim, Plaintiffs fail to allege that the Individual Defendants are fiduciaries. Rather, as the TAC alleges, the Committee was the fiduciary with relevant authority over OIA investments, and there are no allegations sufficient to impute that fiduciary authority to its individual members.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts accept well-pleaded facts, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

When considering an ERISA fiduciary's conduct, the Supreme Court requires a "careful, context-sensitive scrutiny" of a plaintiff's allegations to separate the "plausible sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). A complaint passes Rule 12 muster only if the fiduciary's alleged conduct falls outside "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). And "to the extent a plaintiff asks a court to infer that a fiduciary used improper methods based on the performance of [other] investments," they "must compare that performance to funds or investments that are ***meaningfully similar***." *Anderson*, 137 F.4th at 1023 (emphasis added).

## III. BACKGROUND

### A. ESOP Participants Are Entitled to the Value of Vested Shares at Separation.

Congress created employee stock ownership plans ("ESOPs") to allow employees to profit from the appreciation of their employer's equity. Congress "designed [ESOPs] to invest primarily in" employer stock and ***specifically exempted*** them from ERISA's duty to diversify investments. 29 U.S.C. § 1107(d)(6)(A); *see also id.* § 1104(a)(2).

The value of an ESOP participant's account fluctuates based on, among other things, the number of shares allocated to their account and the per-share value. *See Armstrong v. Amsted Indus., Inc.*, No. 01 C 2963, 2004 WL 1745774, at *1 (N.D. Ill. July 30, 2004). Participants may receive distributions when they reach retirement age, separate from employment, or meet other plan conditions. 26 U.S.C. §§ 401(a)(28)(B)(iii) & 409(d)(1), (o)(1)(A). The value of the ESOP's shares is determined annually based on an independent appraiser's analysis, *id.* § 401(a)(28)(C), and ERISA requires ESOP sponsor companies to fund a separated or retired employee's payout—the "repurchase obligation"—using the per-share value set by the trustee. *Fish v. GreatBanc Tr. Co.*, No. 09 C 1668, 2016 WL 5923448, at *14 (N.D. Ill. Sept. 1, 2016).

The repurchase obligation is a liability that a sponsor must monitor; meeting it can present challenges as the "company prospers[,] its stock appreciates," and employees with large balances retire and cash out. *Id. at* *17 (describing "worr[y] about 'the cash flow

implications of "big" retirements'" that coincided with "explosive" share prices); *Armstrong*, 2004 WL 1745774, at *2 (describing concern over cash reserves where dramatic rise in stock value triggered unexpectedly high ESOP distributions). ESOP sponsors must determine the appropriate method for repurchasing shares from separated to current (and future) participants.

Some sponsors redeem and retire shares—that is, the ESOP sponsor uses corporate funds to purchase the shares directly from the participant and then, typically, retires them. *See Est. of Blount v. Comm'r*, 87 T.C.M. (CCH) 1303 at *22, No. 540-02, 2004 WL 1059517 (T.C. 2004), *aff'd in part and rev'd in part*, 428 F.3d 1338 (11th Cir. 2005); *see also* Chartwell Financial Advisory, Inc., *Should You Releverage Your ESOP?* (2018) at 2 (hereinafter, "Releveraging ESOPs"), https://tinyurl.com/37c6mm34. Other sponsors "recycle" shares—that is, the employer voluntarily contributes funds to the ESOP, which uses the funds to repurchase shares directly from departing participants and immediately reallocate them to existing participants, keeping the shares within the ESOP. Releveraging ESOPs at 1.

**B. The ESOP Recycles Shares to Keep Them Within the Plan.**

Founded in 1968, WESC is an award-winning full-service electrical contractor and one of the Southwest's largest electrical experts. *See* WESC, *About*, https://www.wilsonelectric.net/about/ (last visited Dec. 11, 2025). Founded in 2005, WESC's ESOP has owned 100% of WESC's stock since 2019. *See* TAC ¶¶ 17, 52.

The ESOP's "Plan Document" contains the rules for ESOP administration and participation. *See* Ex. A.[1] Each participant's share of the ESOP's assets is reflected in two accounts: (i) a Company Stock Account, reflecting each participant's allocable share of

[1] "A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see* TAC ¶ 24 ("Defendants were responsible under the ESOP's Plan Document for setting the investment policy for the OIA and monitoring the performance of its investments."); *see also id.* ¶ 50.

WESC stock, and (ii) the OIA reflecting each participant's allocable share of the plan's other holdings, if any. *See id.* § 7(a)-(c). The dollar value of the Company Stock Account fluctuates based on the number and value of shares, and the OIA fluctuates based on payouts to departing participants and investment income (or loss). *See id.*

Participants cannot contribute their own funds to the ESOP, *see id.* § 2, and participants are not guaranteed any monetary benefit—only the right to obtain the value of their vested shares at the times described in the Plan Document. If a participant dies, becomes disabled, or retires, distributions from that participant's ESOP account must begin within one year. *See id.* § 14(a). Distribution must begin during the sixth plan year following all other separations. *See id.* § 14(b)(1).

WESC recycles the ESOP's shares: the ESOP repurchases shares from separated employees and immediately reallocates them to employee-participants. *See* TAC ¶ 53. To facilitate recycling, the Plan provides that "the Trust shall exchange any cash or other liquid assets held in the [OIA] of Participants for the shares of Company Stock held" by the separating employee. *See* Ex. A § 14(g). Post-exchange, terminated employees' ESOP accounts become "Undistributed Accounts." *Id.*

The ESOP has historically invested OIA monies in safe, liquid investments to ensure that there are sufficient funds available to meet the ESOP's needs, including to repurchase stock from WESC's separated employees, pay distributions, and make the required payments associated with the ESOP's 2019 share purchase transaction. *See* TAC ¶¶ 52, 58 n.13. During the class period, the value of the ESOP's stock holdings has ***increased more than tenfold***, from $20 million to $229.9 million. The ESOP's non-stock holdings have averaged 18% of the ESOP's total assets during that same period. *See* Exs. B-H (2018-2024 ESOP Form 5500s) at Schedule I ("Schedule of Assets Held at End of Year").

## IV. ARGUMENT

### A. Defendants did not Act Imprudently.

Plaintiffs fail to adequately allege that Defendants violated ERISA's fiduciary duty of prudence. ***First***, the Ninth Circuit has expressly foreclosed Plaintiffs' theory. ***Second***,

as another court recently held, "Defendants were under no duty to diversify any part of the [ESOP], let alone the cash buffer" held in the OIA. *Trull*, 2025 WL 2803605, at *4. ***Finally***, the TAC alleges facts demonstrating that Defendants acted prudently.

**1. The Ninth Circuit foreclosed Plaintiffs' theory in *Anderson*.**

Plaintiffs allege that the ESOP's capital preservation strategy is per se imprudent as a prima facie violation of ERISA. *See* TAC ¶¶ 27 (alleging a capital preservation strategy for retirement plans is "unusual and imprudent"), 34 (alleging that "***[n]o prudent fiduciary*** . . . would invest 100% of their portfolio in cash equivalents") (emphasis added), 49 ("The ESOP's purpose is to provide a retirement benefit that will grow over time, not to preserve the value of the principal amount invested."); *see also* TAC ¶ 51 ("[L]ong-term capital appreciation is the default objective of retirement investments."), ¶ 64 ("[S]tock investments are the safer bet to maximize funds for recycling transactions, not cash equivalents."). But the Ninth Circuit slammed the door on any such theory earlier this year, holding that "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns. To the contrary, courts have routinely rejected claims that an ERISA fiduciary can violate the duty of prudence by seeking to minimize risk." *See Anderson*, 137 F.4th at 1024 (cleaned up); *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) ("ERISA 'does not create an exclusive duty to maximize pecuniary benefits.'").

Just like the plaintiff in *Anderson*, Plaintiffs' theory here relies on pitting the returns from one form of investment (i.e., cash equivalents) against the returns from a supposedly better-performing alternative (the S&P 500). But "[t]hat argument conflates the risk-mitigation objective . . . with the allocation decisions made to implement that objective." *Anderson*, 137 F.4th at 1023-24. The Ninth Circuit recognized that Anderson was challenging the former, having alleged that "in pursuing a purported risk-mitigation strategy, the Intel Funds gave up the long-term benefit of investing in equity, which delivers superior returns." *Id.* at 1024. So, too, here. *See* TAC ¶¶ 33-34 ("An investor over any 10-year period shown would have been far better off invested stocks and other asset classes than cash

equivalents[.] . . . No prudent fiduciary . . . would invest 100% of their portfolio in cash equivalents for the long term[.]").

In expressly recognizing that risk mitigation and capital preservation can comport with ERISA's duty of prudence, *Anderson*, 137 F.4th at 1023-24, the Ninth Circuit sounded the death knell for Plaintiffs' claim here. *See Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) ("The district court does not have the authority to ignore circuit court precedent[.]"). Because Plaintiffs' theory endeavors to rewrite ERISA in direct contravention of dispositive Ninth Circuit authority, the TAC must be dismissed.

**2. Congress Exempted ESOPs from ERISA's Duty to Diversify.**

Even if *Anderson* were not dispositive—it is—Plaintiffs' claim still fails because ERISA specifically exempts ESOPs from the duty to diversify plan investments, as the *Trull* court recently held while rejecting the exact same theory Plaintiffs' counsel now advances.

"ESOPs are 'invest[ed] primarily in' employer stock, and are therefore not diversified by design." *Trull*, 2025 WL 2803605, at *2 (citing 29 U.S.C. § 1107(d)(6)(A); *Dudenhoeffer*, 573 U.S. at 416). Therefore, Congress provided ESOP fiduciaries "a statutory exemption from some of the duties imposed on ERISA fiduciaries, including the duty to diversify." *Id.* ERISA specifically provides that, in the case of ESOPs "the diversification requirement of [§ 1104(a)(1)(C)] and the prudence requirement (only to the extent that it requires diversification) of [§ 1104(a)(1)(B)] [are] not violated by acquisition or holding of [employer stock]." 29 U.S.C. § 1104(a)(2). As such, ESOP fiduciaries are "not obliged under § 1104(a)(1)(C) to 'diversif[y] the investments of the plan so as to minimize the risk of large losses' or under [29 U.S.C.] § 1104(a)(1)(B) to act 'with the care, skill, prudence, and diligence' of a 'prudent man' insofar as that duty 'requires diversification.'" *Dudenhoeffer*, 573 U.S. at 417. This means that ESOP fiduciaries ordinarily cannot "be taken to task for failing to diversify investments, regardless of how prudent diversification would be under the terms of an ordinary non-ESOP pension plan." *Moench v. Robertson*, 62 F.3d 553, 568 (3d Cir. 1995), *abrogated on other grounds by Dudenhoeffer*, 573 U.S. at 409.

Therefore, as the *Trull* court explained, ESOP fiduciaries are "under no duty to diversify any part of the plan, let alone the cash buffer[]" held in the OIA. 2025 WL 2803605, at *4; *see also Dudenhoeffer*, 573 U.S. at 412 ("ESOP fiduciaries . . . need not diversify the fund's ***assets***.") (emphasis added); *Spires v. Schools*, 271 F. Supp. 3d 795, (D.S.C. 2017) ("[A]lleging that the Fiduciary Defendants should have found a new company (***or other asset***) for the ESOP to own cannot[]" state an ERISA claim.) (emphasis added).

Indeed, "this is the very type of claim Congress sought to protect against," for "[h]ad the [OIA] cash buffer been de minimis, . . . the [ESOP] may have been unable to adequately pay departing employees or repurchase shares" as required to ensure the ESOP's continued sustainability. *Trull*, 2025 WL 2803605, at *3; *see also infra* § IV(B)(1). Had Defendants "[held] the cash buffer steady or reduce[d] it and then the [WESC] stock price drop[ped] or payouts and repurchases [were] higher than anticipated, plan participants might assert a duty-of-prudence claim for not increasing the cash buffer to mitigate losses." *Trull*, 2025 WL 2803605, at *3. On the flip side, if Defendants "increase[d] the [OIA's] cash buffer and then [WESC's] stock price [rose] or employee payouts and share repurchases [were] less than anticipated, plan participants might assert a duty-of-prudence claim against them for allowing the cash buffer to generate 'investment drag.'" *Id.* (quoting *Perrone v. Johnson & Johnson*, 48 F.4th 166, 177 (3rd Cir. 2022)).

In light of this catch-22, "[t]o hold Defendants accountable for diversifying the ESOP cash buffer . . . even though they are expressly not required to do so, would leave them 'between a rock and a hard place and likely to be sued for imprudence either way if [they] guess[ ] wrong.'" *Id.* (citation omitted). This is the proverbial "razor's edge" on which courts have warned against placing fiduciaries. *Armstrong v. LaSalle Bank N.A.*, 446 F.3d 728, 733 (7th Cir. 2006). Requiring Defendants to "walk such a precarious tightrope . . . risks subverting Congress's objective to encourage employers to establish and maintain ESOPs," which is "untenable." *Trull*, 2025 WL 2803605, at *4 (citing *Dudenhoeffer*, 573 U.S. at 419).

### B. The TAC Alleges that Defendants Acted *Prudently*.

Far from alleging Defendants acted imprudently, the TAC actually alleges that Defendants prudently managed the ESOP's OIA assets throughout the relevant period.

#### 1. The ESOP's assets were managed to ensure the ESOP's sustainability.

ERISA requires that fiduciaries be judged against an objectively prudent person "in the conduct of an enterprise of a like character and with like aims"—here, an ESOP. 29 U.S.C. § 1104(a)(1)(B). "In applying [ERISA's] fiduciary standards to an ESOP, it is important to understand the purposes of an ESOP." Comm. on Finance, Emp. Stock Ownership Plans: Senate Emp. Handbook, 96th Cong. 2d Sess. 26 (1980) (hereinafter "Senate Emp. Handbook"), https://tinyurl.com/2tnnne2z; *Dudenhoeffer*, 573 U.S. at 416 (explaining that, unlike other retirement plans, an ESOP has as its primary objective the providing of stock ownership interests for employees).[2]

Plaintiffs' allegations make clear that the ESOP's fiduciaries managed the ESOP's assets to support the ESOP's repurchase strategy of share recycling, *see supra* § III(B)—a commonplace approach long-recognized as prudent. *See Blount*, 2004 WL 1059517, at *22. The strategy maintains a stable number of shares outstanding so that the ESOP's percentage ownership is not reduced; keeps shares within the plan and, thus, within the plan's control; and provides an immediate benefit to remaining participants (*i.e.*, current employees), who are allocated shares as soon as they are repurchased from their departing colleagues. *See supra* § III(A).

---

[2] Plaintiffs will argue that an ESOP's assets should be invested like any other retirement plan simply because ERISA contains no "special presumption favoring ESOP fiduciaries." *See Dudenhoeffer*, 573 U.S. at 418. To be crystal clear: Defendants ***do not seek a special pleading-stage presumption*** of the kind *Dudenhoeffer* rejected, nor do they argue that ERISA's prudence bar is lowered for ESOP fiduciaries. Instead, consistent with *Twombly* and *Iqbal* as applied to ERISA claims in cases like *Dudenhoeffer*, the Court's "context specific" inquiry into the sufficiency of Plaintiffs' claims requires that it evaluate Defendants' alleged conduct in light of the "character" and "aims" of the particular "enterprise" at issue—here, an ESOP. *See Trull*, 2025 WL 2803605, at *3 ("[Plaintiff]'s claims . . . fail[] to clear the high hurdle set by Congress and reinforced . . . in *Dudenhoeffer*.").

To facilitate share recycling, "there must be sufficient cash . . . to acquire that stock," meaning it is crucial that the employer "maintain the plan so as to provide sufficient liquidity" and ensure that "the plan is sufficiently funded to permit a distribution of benefits to each participant." Senate Emp. Handbook at 33; *see also Perrone*, 48 F.4th at 171, 177 ("The ESOP additionally includes a small cash buffer, which provides the cash necessary for daily liquidity. . . . A cash buffer is a common component of an ERISA retirement savings plan."); *Trull*, 2025 WL 2803605, at *3 ("Had the cash buffer been de minimis, as Trull suggests is not just permissible but *required*, the Plan may have been unable to adequately pay departing employees or repurchase shares.").

This is precisely the manner in which the WESC ESOP was administered. Consistent with its repurchase policy and sustainability goals, the ESOP held non-company stock assets in safe investments, thereby providing sufficient liquidity for the plan's recycling strategy and aligning with Congress's goal for ESOPs: to enable employees to profit from the equity growth that their labor helped generate. *See supra* at 3. Following a capital preservation strategy protected participant payouts from the risk of market losses, ensuring that the ESOP maintained funds sufficient to acquire full ownership of WESC, pay distributions, and perpetuate itself via recycling. It thus allowed the ESOP to keep its shares rather than cede them back to the company in annual repurchases, maintained a stable ownership percentage, and reallocated shares to active participant accounts (*i.e.*, current employees). At the very least, this approach was within "the range of reasonable judgments" given the relevant context. *Hughes*, 595 U.S. at 177.

Plaintiffs are wrong to argue that the ESOP's fiduciaries should have gambled with its employer contributions because WESC's historically rising stock price means that "the same profit levels . . . will continue or improve in the future." TAC ¶ 61 (footnote omitted). While past performance is relevant to future performance, it is not dispositive. Many ESOPs experience rapid changes in fortune. *See Gamino v. KPC Healthcare Holdings, Inc.*, No. 5:20-cv-1126, 2022 WL 4596576, at *9 (C.D. Cal. Aug. 15, 2022); *Fish*, 2016 WL 5923448, at *1 (considering ESOP where, despite years of "dynamic growth," share

prices fell "precipitously," driving company to bankruptcy). Even if Plaintiffs were correct that WESC's stock price will always rise, they still cannot state an imprudence claim. A rising stock price means higher account value, a larger repurchase obligation, and a greater likelihood of a "run on the bank." *See, e.g.*, *Fish*, 2016 WL 5923448, at *24.

In *Fish*, a rise in the company's per-share value caused participants with large accounts to exercise their put options en masse. *See Fish v. GreatBanc Tr. Co.*,749 F.3d 671, 677 (7th Cir. 2014). The company drew so heavily from its corporate accounts to meet the surging repurchase obligation that it "depleted [its] remaining cash reserves" and was forced into bankruptcy, which rendered "worthless" the balances of its remaining ESOP participants. *Id.* Those remaining participants sued, claiming the ESOP's decision-makers should have better managed the repurchase obligation to prevent the company's collapse. *Id.* at 675-78. WESC's use of an in-plan, liquid buffer creates a judgment-proof, creditor-proof account controlled by the ESOP, avoiding any bankruptcy-induced losses like those experienced in *Fish*. Indeed, had Defendants followed Plaintiffs' stock-on-stock approach during a market downturn, they doubtless would have been subject to a mirror image lawsuit faulting them for an imprudently aggressive investment strategy. *See supra* at 8.

Far from violating ERISA, Defendants' responsible approach fell well within the "range of reasonable judgments" an ESOP fiduciary may make to preserve available funds for future distributions. *See Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996) (holding that trustees must "preserve assets to satisfy future, as well as present, claims" and must make decisions that "account [for] the interests of all beneficiaries"); *Phillips v. Cobham Adv. Elec. Solutions, Inc.*, No. 23-cv-3785, 2025 WL 2689268, at *5 (N.D. Cal. Sept. 19, 2025) ("'[T]he complaint suggests that [Defendants'] choices had their intended effects' of mitigating risk during market downturns[.]") (quoting *Anderson*, 137 F.4th at 1025).

**2. Even under Plaintiffs' novel theory, Defendants still acted prudently.**

Even assuming the truth of Plaintiffs' theory that ESOP fiduciaries ***do*** have a duty to diversify plan assets, *see supra* § IV(A)(2), Defendants managed the ESOP prudently.

***First***, the ESOP's fiduciaries invested its assets consistent with what Plaintiffs say is the "'consensus' asset allocation decisions of professional retirement portfolio managers." TAC ¶ 40. The TAC's central theory is that the ESOP's assets were invested conservatively assuming a short investment time horizon, when they instead should have been invested aggressively assuming a long investment time horizon. *Id.* ¶ 48. Investors on a 20-year time horizon like the ESOP,[3] Plaintiffs say, would choose an asset allocation of "80% stocks" and 20% fixed income, cash equivalent, and inflation protection vehicles. *Id.* ¶ 40, n.7 (citing article allegedly showing 80% allocation to equity and 20% allocation to fixed income, cash equivalent, and inflation protection vehicles).[4]

This is ***precisely*** the asset allocation the ESOP's fiduciaries selected, on average, during the class period: 80% or more in equities—namely, WESC: a risky, single employer security—with the remaining 20% invested conservatively as a hedge against the riskier equity tranche. *See In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 150, 158 (3d Cir. 1999) (affirming trial court finding that investing 20% of assets in "more conservative funds that was intended to return principal with interest" was prudently diversified). Indeed, in five of the seven years in the class period, the ESOP's allocation to equities was ***more aggressive*** than Plaintiffs' proposed 80% floor:

[3] ESOP participants are scheduled to obtain all of the shares the ESOP purchased in 2019 by 2039. TAC ¶ 58 n.13.

[4] Plaintiffs will argue on the merits through their testifying expert that an 80% equity / 20% fixed income asset allocation is appropriate. *See* Dkts. 157 at 4, 157-4 ¶¶ 132-133.

| Date[5] | ESOP Company Stock Value | As % | ESOP OIA Value | As % |
|---|---|---|---|---|
| 2018 | $19,966,533 | 55% | $16,575,153 | 46% |
| 2019 | $38,401,188 | 77% | $11,702,646 | 23% |
| 2020 | $51,350,055 | 90% | $5,754,352 | 10% |
| 2021 | $56,973,427 | 86% | $9,512,915 | 14% |
| 2022 | $72,928,851 | 85% | $12,453,552 | 15% |
| 2023 | $140,703,607 | 90% | $15,511,485 | 10% |
| 2024 | $229,929,896 | 91% | $22,812,865 | 9% |
| | ***Average:*** | ***82%*** | | ***18%*** |

Thus, the ESOP's fiduciaries invested its assets ***exactly*** as Plaintiffs say a prudent fiduciary would have. The Court's inquiry should end here in light of dispositive Ninth Circuit precedent. *See Anderson*, 137 F.4th at 1024 (explaining that a "per se challenge" to certain investments "overlooks that the prudence of each investment is not assessed in isolation but, rather, as the investment relates to the ***portfolio as a whole***") (cleaned up).

***Second***, Plaintiffs claim that Defendants should follow "the principles of modern portfolio theory, which recognizes that while the individual riskiness of a particular investment cannot be eliminated, it can be managed through the diversification of investment assets." *Anderson*, 137 F.4th at 1025; *see, e.g.*, TAC ¶ 40. But because ERISA fiduciaries are responsible for investing *all* of the trust's assets, assuming Plaintiffs' theory regarding the applicability of the duty to diversify were true—which it is not, *see supra* § IV(A)(2)—the relevant portfolio in which participants are invested and that fiduciaries would need to diversify is the ESOP trust *as a whole*. *See* 29 C.F.R. § 2550.404a-1 (requiring consideration "of . . . the role the investment or investment course of action plays in that portion of ***the plan's investment portfolio . . . with respect to which the fiduciary has investment duties***") (emphasis added).

In short, Plaintiffs miss the forest for the trees by focusing exclusively on one sleeve of the ESOP's portfolio, which included only 20% of the ESOP's assets during the class

[5] *See* Exs. B-H (2018-2024 ESOP Form 5500s) at Schedule I ("Schedule of Assets Held at End of Year"). In 2024, the ESOP's OIA was *itself* compromised of additional equities—approximately 20% of the OIA's value. *See* TAC ¶ 38.

period and served as a hedge against the ESOP's riskier, mandatory single employer security holdings.

### 3. The Court cannot infer imprudence from the other ESOPs referenced in the TAC.

Plaintiffs' references to other ESOPs that purportedly employed a different investment strategy, which they say suggests that WESC is an imprudent outlier, TAC ¶¶ 42-44, do nothing to support their imprudence claim. Rather than providing any meaningful comparison, Plaintiffs' broad generalizations and discussion of selective information regarding a cherry-picked, minuscule group of ESOPs do not support their sweeping conclusion that "prudent ESOP fiduciaries invest the excess funds in assets that offer greater potential for long-term capital appreciation than cash equivalents," *id.* ¶ 42. Plaintiffs concede that 11 of the 49 ESOPs that they allude to ***did not*** invest OIA assets in stocks, implying that over 20% of the ESOPs within ***their own select group*** are imprudently managed. *Id.* ¶ 44.

Worse still, Plaintiffs' references to other ESOPs fall far short of providing any meaningful benchmark against which the Court can make any effective comparisons. As the Ninth Circuit recently explained, when plaintiffs allege that a defendant has breached the duty of prudence because "a prudent fiduciary in like circumstances would have selected a different fund based on the cost or performance of the selected fund, that plaintiff must provide a sound basis for comparison." *Anderson*, 137 F.4th at 1022 (cleaned up). Otherwise, as here, the Court is left "[c]omparing apples and oranges," which "is not a way to show that one is better or worse than the other." *Id.* at 1025 (citation omitted). Cherry-picking a small sample of ESOPs that employed a different strategy than WESC, without more, tells nothing about the particular circumstances facing the WESC ESOP and the prudence of the process that led to the decisions Plaintiffs now challenge. But "[t]he need for a relevant comparator with similar objectives—not just a better-performing plan or investment—is implicit in ERISA's text," which "makes clear that the goals of the plan matter." *Anderson*, 137 F.4th at 1022; *see also id.* (allegations that "costs are too high, or returns are too low" are insufficient) (citation omitted).

Plaintiffs fail to identify any relevant facts about the other ESOPs referenced in the TAC that suggest those ESOPs face circumstances comparable to the WESC ESOP or operate "an enterprise of a like character and with like aims" as the WESC ESOP, leaving the Court without an apples-to-apples comparison. 29 U.S.C. § 1104(a)(1)(B). For example, we know nothing about the comparators' anticipated employee retirements or separations, payout terms, anticipated share purchase transactions or associated payment obligations, or the systems each uses for repurchasing shares. *See Phillips*, 2025 WL 2689268, at *6 ("Plaintiffs do not allege any other details about the underlying [funds], including their asset allocations or other considerations like fees. Accordingly, the Court cannot infer that the [funds] are 'meaningfully similar[.]'") (quoting *Anderson*, 137 F.4th at 1023).

*Anderson* requires far more, and although Plaintiffs acknowledge that factors such as "the time horizon, financial objectives, and risk tolerance" of an ESOP's beneficiaries can differ from ESOP to ESOP, TAC ¶ 39, they fail to allege any such information regarding their purported comparators. *See id.*, ¶¶ 43-44. Absent such crucial context, it is impossible to compare the prudence of the comparator ESOPs to the WESC ESOP.

**C. Plaintiffs Fail to Allege that the Individual Defendants are Fiduciaries.**

Plaintiffs' claim against the Individual Defendants fails for yet another reason: it is predicated on their purported fiduciary status, *see* 29 U.S.C. § 1104(a)(1), yet the TAC lacks factual allegations sufficient to show fiduciary status.

There are two types of ERISA fiduciaries that are relevant here: (i) named fiduciaries designated in the plan document, *see id.* § 1102(a)(2), and (ii) functional fiduciaries, who become fiduciaries by virtue of their actions or authority, *see id.* § 1002(21), but only "to the extent" that they "exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets" or have "any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*; *see also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("[T]he threshold question is . . . whether [the defendant] was acting as a fiduciary . . . ***when taking the action subject to complaint***.") (emphasis added); *Cheap*

*Easy Online Traffic Sch. v. Peter L. Huntting & Co.*, 818 F. App'x 683, 685 (9th Cir. 2020) ("[F]iduciary status requires the actual exercise of discretionary authority.").

The Individual Defendants are not named fiduciaries. The terms of the ESOP provide that "[t]he [] Committee and the Company"—***the entities, not the individuals***—are the named fiduciaries with authority over OIA investments, and those entities were *already* named as Defendants before the Individual Defendants were added. *See* Dkt. 1; Dkt. 48.

Individuals "are not fiduciaries merely because" the corporate entity they are affiliated with "is a fiduciary." *In re JDS Uniphase Corp. ERISA Litig.*, No. C 03-04734, 2005 WL 1662131, at *3 (N.D. Cal. July 14, 2005); *see Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1460 (9th Cir. 1995) ("Agency interpretations of ERISA indicate fiduciary status depends on an individual's functional role rather than title."); *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 509 (D.N.J. 2021) (holding that "Plaintiffs have failed to sufficiently allege that individuals on the Board – ***as opposed to the Board itself*** –" were fiduciaries) (emphasis added); *Alas v. AT&T Inc.*, No. LACV 17-08106, 2019 WL 1744847, *4 (C.D. Cal. Feb. 25, 2019) (dismissing claims against individual defendants where complaint "pleads no acts of the Individual Defendants that allegedly breached their fiduciary duties, but merely notes that they were members of the [committee]").

Instead, to claim that the fiduciary authority belonging to the Committee as an entity passed through to one of its members, Plaintiffs must allege that the individual actually exercised fiduciary authority that rightfully belonged to the Committee. *See Chesemore v. Fenkell*, 829 F.3d 803, 814 (7th Cir. 2016) (finding that defendant was a fiduciary "[a]s a functional matter" where he "effectively controlled both sides of the transaction"); *see also Vang v. Geil Enters. Inc.*, No. 1:23-cv-447, 2023 WL 3168513, at *3 (E.D. Cal. Apr. 28, 2023) (dismissing ERISA fiduciary claims where plaintiff offered no "facts suggesting that [individual defendants] had control or authority over ESOP assets"). Committee membership, without more, is insufficient. *Luense*, 541 F. Supp. 3d at 509 (dismissing claim against committee members when plaintiffs alleged only a "conclusory assertion" that "each exercised discretionary authority over management or disposition of Plan assets").

Yet that is all Plaintiffs offer: they do not allege that any individual caused the Committee to act outside of its normal procedures, or that the Committee assigned its fiduciary responsibility to any of its members, or that any Committee member usurped the Committee's authority or dominated the Committee so as to be the de facto fiduciary. *See Wright*, 360 F.3d at 1101-02 (explaining that "an individual or entity can . . . be found liable as a 'de facto' fiduciary if it lacks formal power to control or manage a plan yet exercises informally the requisite 'discretionary control' over plan management and administration"). Nor could they. *See* A.R.S. § 10-3824(D) (corporate boards may act only through "the affirmative vote of a majority of directors present"). Plaintiffs' failure to allege ***any*** act taken by ***any*** Individual Defendant concerning ***any*** aspect of their case is fatal to the TAC's claim against the Individual Defendants. *See Daly v. W. Monroe Partners, Inc.*, No. 21 C 6805, 2023 WL 2525362, at *5 (N.D. Ill. Mar. 15, 2023) ("Plaintiff fails to make any allegations as to specific Board or Committee members, so none are currently implicated in the breach-of-fiduciary-duty claim. Accordingly, the motion to dismiss . . . as to individual Board and Committee members is granted.").

**D. Plaintiffs Fail to State Monitoring & Co-fiduciary Liability Claims.**

Although the TAC also alleges that WESC failed to adequately monitor the Committee and the OIA's investments, TAC ¶¶ 65, 85, this derivative claim fails because (i) Plaintiffs' sole monitoring allegation, *see id.* ¶ 65, is conclusory and insufficient to state a claim, and (ii) there is no underlying breach, *see supra* § IV(A), (B), (C). *See White v. Chevron Corp.*, No. 16-cv-793, 2016 WL 4502808, at *19 (N.D. Cal. Aug. 29, 2016).

Plaintiffs' claim for co-fiduciary liability, TAC ¶¶ 87, which is also derivative, must be dismissed because Plaintiffs fail to adequately allege that there was any "underlying violation." *See Monper v. Boeing Co.*, 104 F. Supp. 3d 1170, 1180 (W.D. Wash. 2015).

DATED: December 11, 2025

Respectfully submitted,

/s/ Andrew D. Salek-Raham
Lars C. Golumbic, *admitted pro hac vice*
Andrew D. Salek-Raham, *admitted pro hac vice*
Lawrence A. Brett, *admitted pro hac vice*
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave, N.W.
Suite 1200
Washington, D.C. 20006
(202) 857-0620 (phone)
(202) 659-4503 (fax)
lgolumbic@groom.com
asalek-raham@groom.com
lbrett@groom.com

*Attorneys for Defendants*

## CERTIFICATE OF CONFERRAL

Undersigned counsel for Defendants hereby certifies that, pursuant to LRCiv 12.1(c) and this Court's July 17, 2024 Order (Dkt. 22), counsel for Defendants met and conferred with counsel for Plaintiffs regarding the issues asserted in Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and Supporting Memorandum of Law by video conference on December 10, 2025. The Parties were unable to agree that the Third Amended Complaint was curable in any part by a permissible amendment offered by Plaintiffs.

*/s/ Andrew D. Salek-Raham*
Andrew D. Salek-Raham

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2025, I electronically submitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record in the ECF System.

*/s/ Andrew D. Salek-Raham*
Andrew D. Salek-Raham